v.D.V.  The United States Court of Appeals for the Federal Circuit is now open in its session. God save the United States and the Honorable Court. Thank you. Be seated. Good morning, everyone. The first argued case this morning is No. 141470, CCI, Incorporated, against the Army. Mr. Howard. Thank you, Your Honor. Jim Howard on behalf of Appellant CCI. Your Honor, this case arises out of a construction project in Iraq that was arranged by the United States as part of its efforts to stabilize the country in Iraq at the end of the surge in around 2008. The Army Corps of Engineers, or ACE, as it's often referred to, put out an RFP for a pier and seawall, a request for proposals from contractors to build a pier and seawall for the Iraqi Navy in Umm Qasr along the Kwar-al-Jabbar River. Now, critical to this appeal included in that RFP was an Andrea engineering report. This was from Andrea Engineering Test Laboratories. That report had been performed at the exact site of the construction project we're here discussing today for the purposes of assessing the viability of construction of a dock or pier. Doesn't the Andrea report create a reasonable foreseeability on your part as to the stability of the soil in question? That's exactly right, Your Honor. No, I'm sorry. I think I understand your question. Your Honor, the Andrea engineering report is critical because what it does is it tells us what we can rely on as a contractor. But if you look in the Andrea engineering report, it was issued by the government. The government then makes it part of its proposal. And the way the process works, the contractors are able to submit questions that they have to the government in the bidding process. Those questions are then answered by the government, and those answers are given to all the contractors to then rely on in order to form part of their bidding process and to form part of the contract that they're bidding on. That report itself, there was questions about it. There was two questions that were asked. One, is this all the soil data that we're going to get? Government answered, yes, this is all you have. Use this. Then there was another question, and these were CCI questions and questions from other contractors as well. Other question, what about these three boring hole logs that are contained in the report? Should these be used across the entire site? The government had a lot of options in answering that question. It could have said, no. It could have said, you need to do an independent investigation. It could have had some type of phased approach. It had many choices to make at that juncture. What the government decided to do is to say, yes. Part of the report, I guess, favored your position, and another part did not. Well, Your Honor, I think what we have to focus on is the government's answer. It said, use the boring hole logs and apply them across the entire site. Now, as it turns out, that wasn't a good decision by the government. It didn't lead to accurate information about the site. But it's the decision that the government made, and it's the decision that then the contractors had to live with and rely on. That boring hole logs, if you look at the logs, all the data that's in those logs, all that's contained in those, is two things. One is, it has a standard soil penetration test. That's just a test where something like a pipe is driven into the ground in a standard, uniform, industry-accepted way, and the number of blows that are measured for each increase in depth, each foot of additional increase, is calculated. I suppose this is a shear testing, right? No, that's different. That's actually something different. The standard penetration test is what's in the boring log itself. There will be some numbers. It says how many blows for each depth. Engineers then can correlate that with soil density. It's the most accepted, commonly understood way of measuring soil density in the field. So that's a field test that's performed. Now, next to that are also verbal descriptors. So somebody then making a judgment subjectively and verbally, soft, medium, describing the soil conditions. Now, there is a certain tension in the boring logs, and that was one of the things that's been discussed, between those verbal descriptors and the soil penetration test itself. Now, the testimony from all of the engineers, including the governments, was that the soil penetration test, those numbers, that's what engineers rely on. So it makes sense. If you're a contractor, if you're an engineer, you're acting reasonably. Do you look at the hard data, the hard numbers, to understand what conditions you're encountering? Or do you look at someone's subjective verbal descriptor? When you do look at – I mean, a report is a report. And it's given information as to the density of the soil, right? At the construction site. And the report says that the soil at the project site was very soft. Right. It says that when you squeeze the soil into a fist, that it exudes between the fingers. Less aggressive type of testing wasn't being able to use because of the instability and the softness of the soil. Why don't those count? So a couple of points to make there, Your Honor. First, that discussion is not in the part of the report the government told everybody, use the boring hole logs as your understanding of the density. We're not giving you additional data. Use those logs. Apply them across the entire site. That doesn't have that textual discussion that you're talking about. The boring hole logs are where the data is collected by the field engineer running that test and measuring how many blows it actually took for somebody there with a 140-pound hammer dropped from a standard distance to put this pipe, you know, each additional distance into the ground. So that's what the government, in its own words, said. We've decided to tell you this is what you should use, not the other portions of the report. What kind of legal authority can you cite then that supports the position to that the government hands you a report, tells you to look at the boring data, and that means, here's the authority I'm looking for, that means that all the other data in the report are not relevant or cannot be used to create a reasonable foreseeability issue. If I could make just one or two points in response, and I'll try and point you to the authority as part of that too. On the points that you're talking about, there was a shear test that was performed. That's part of the laboratory analysis. So disturbed samples, in other words, samples that were collected are then taken back to a laboratory and analysis was run on that. The Engineering Research and Development Center of the Army Corps was consulted, actually, by the Army Corps of Engineers to say, well, let's take a look at this Andrea Engineering report. We now have a request for an equitable adjustment. You know, this site has failed. We're all surprised by that. What could a contractor have gleaned from this Andrea Engineering report? And what ERDC did is they said, okay, well, we're going to ignore the boring hole log data, even though that's what the government told everyone to rely on. And that's what the case law, which I'll talk about in a moment, says the contractors are entitled to rely on. The boring hole log data is standard data that engineers, contractors, would focus on for an actual understanding of what's down there in the soil. They said, even if we use this shear test data, and they criticized in some parts how it was handled and tracking which samples came from where, and the fact that it's also disturbed samples means it's harder to get an actual assessment of the density of the soil at that point. But they said, even if we use that, the government itself, ERDC, so the experts that even engineers consult, said, we look at that data and the report, and we agree that a crane pad somewhat in excess of three meters should be constructible based on the Andrea Engineering Report with the necessary safety factor on top of it. So, in other words, with a 1.0 safety factor, which is essentially what engineers require in order to make sure you have a stable foundation to work off of. And so the government is saying, well, you should be able to build one based on the Andrea Engineering Report, three meters or more. And there is no dispute in the record that this crane pad, instead, failed under that three meter mark. It never reached that mark. So even if you're using that analysis and rejecting what the government said, which is rely on the boring hole logs, this still should have been able to be... They didn't say rely only on the boring hole logs. Well, Your Honor, I have to disagree somewhat there because... Show me the record where the government says rely only on the boring hole logs. Your Honor, I'll look to the language if you could give me just a second here. And what the government says is question 42. And this is A04838. Geotechnical conditions. So this is a question that CCI said and put out evidence. It did ask and certainly was asked as part of this process. So are you telling us that the government should have known that the proposal that your client made for this land base and so on wouldn't work because of the Andrea report? One of the things that's troubling about all of this is that now, apparently from the record and from the testimony, the government witnesses said anybody looking at this would have known the soil was too soft and it couldn't support the crane and so on and that you couldn't do it. Right. But at this give and take of the discussion, the questions, the contract was awarded on the basis of a proposal that now the government says no reasonable engineer would think would work. Is that perhaps that's an overstatement of the litigation positions, but it comes through nonetheless when you look at that testimony? Your Honor, I think you have captured one of the issues here. That is, and the ASPCA found this too, from the start, CCI had determined that it was going to use a land side construction method. That involved building a temporary crane pad from the start to get started on this process and build the initial cells. The government approved that at the bid phase. The government approved that at the 35% design review phase, and the land side construction was discussed at that phase. And then the core and ERDC then approved that at the 99% design review phase as well. When the ERDC specifically looked at how this project was going to go forward, said, no, we agree, shoaling shouldn't be a problem because of the location of where this is at. We don't think there's going to be deposits here that would be a particular issue, and signed off on the project going forward. Now this is the same government that has the Andrea Engineering Report, has sent it to everybody, and has said, everyone that's bidding on this needs to rely on this exact report. So if the government doesn't raise any flags at all in this process, it's hard for me to see how the government then now, in 20-20 hindsight, says, oh, well, nobody could have possibly relied on the Andrea Engineering Report, particularly where the ERDC itself had done. What type of legal theory are you espousing now? It kind of sounds like you're arguing that there may have been some kind of latent ambiguity in all of this, but I don't see that anywhere in your arguments below. Your Honor, one of the issues we have briefed on appeal, and I know my time is growing short, is that the government seemed to be saying that there was a patent ambiguity here. Let me just ask you this before you run out of time, because we didn't get to this. Whatever the Andrea report says, didn't the board make a finding, a factual finding, that you didn't rely on that report? The board did, Your Honor, and that's a good point, because that's the one element, you're correct, that definitely does get a more deferential review, and it gets reviewed for substantial evidence. Here, however, the government's own witness, Major Himes, conceded at trial, on sworn testimony, that the contractor clearly relied on the Andrea Engineering Report. So the government's own witnesses have said that we relied on the Andrea Engineering Report, and all the evidence in the record also shows that we relied on it from the start, from witness testimony, from the calculations that our engineer performed, where if you track what he was measuring for soil density, it matches up with the- I don't believe Mr. Nottingham. That is true, Your Honor, but the board didn't find anything to- it didn't say we don't find him credible. It rejected- Didn't his proposal, his one-page proposal, contain a graph that was inconsistent with the boring data? That would seem to suggest that he didn't rely on it. It was actually inconsistent with the descriptors and other information in the report. From the boring data. No, the bore log data, though, however, itself, that's interpenetration test density, his soil- Can you clear this up for me? Sure. I'll ask the government to respond, too. Does boring data just mean the blow count, or is boring data the blow count, plus once you pull it out of the ground, descriptors about the various soil? In this instance, Your Honor, it's the blow counts associated with that somebody's made a subjective determination. But, again, that sounds to me like boring data is both the blow count and the subjective descriptors. Right, and all the engineers, including the government, agreed that when you have this tension between somebody's verbal choice and the actual hard data, you go with the hard data. That's how you resolve those distinctions. And to the extent there's an ambiguity, it's construed against the government here. It's its proposal. The government has many means available to it. What it chose here was essentially sloppy. It said, look, we're trying to move fast here. We've got this project in the rack. Just use this for the entire site. The government put out its RFP, and then three weeks later, there was a site investigation, and then three weeks after that, bids were supposed to be in. So, as it turns out, it was a bad decision on the government's part, but it's not something that the contractors- How much of your damages were caused by the change in the manner in which the pier was constructed? Because originally, the RFP was for construction using offshore barges, and CCI proposed that we can do it cheaper if we do it from the shore, and that didn't turn out to be the case, correct? Well, yeah, the RFP, the government didn't care how it was constructed. It just wanted the pier and seawall. CCI's approach was a land-based construction approach, and the whole- The RFP was for offshore barges. It didn't have to be. According to the government, this is clarified, they didn't care as part of the process if it was land side or offshore. Either one was fine, the government concluded, in terms of submitting a bid. So, the bid that CCI used based on the land side construction was cheaper. The court never got into quantum, the amount of damages below. However, CCI's evidence was that this was tremendously more expensive because it had to bring in then six barges, tugboats, cranes, all entire rack, which is extremely difficult at the time to find anybody willing to bring that type of equipment into Iraq at all, let alone then the process of gaining entry into the country. So, it caused massive delays and additional expense. But that isn't part of the determination that was made by the ASPCA. Let's hear from the government. We'll save you rebuttal time. Thank you, Your Honor. Mr. Regner. Thank you, Your Honor, and may it please the court. CCI had the burden below proving all of the elements of its differing site conditions. Claim, the board made findings of fact and conclusions of law that CCI didn't prove any of those. And so, at this stage, in order for CCI to prevail, it must... They're asking for an equitable adjustment. They're telling us that what they did was not unreasonable. Their reliance on the Andrea report was something that they were encouraged to do. Your position is, never mind, you win or lose, all or nothing? Well, that's correct, Your Honor. I mean, at the board, in order for CCI to prevail, they must prove that they, in fact, relied. They didn't prove that they did and that their reliance, had they relied, would have been reasonable. And because they couldn't do that, then they're not entitled to the damages under the international technology versus winner case. But the thing that's troubling is that if it was unreasonable to rely on that report, then why was the report presented to them for reliance, for a reliable description of the site conditions? They weren't told, go out and do some borings and see what the condition of the soil is. They said, we've done it. Here it is. When they asked, they were told they could rely on it, perhaps in an equivocal way. And the government's position, and I think the board's, is that this was unreasonable. You shouldn't have relied on it. You should have done something else. And I'm trying to understand what else they were supposed to have done that they can be required to have done. Okay, let me answer that entire question. I think getting to the point directly, what they should have done and what the board found was when Dr. Apted went out there, and the board found Dr. Apted credible, Dr. Apted went out there and walked out onto the site and he sunk into the soil. And that was one of the indications that had a geotechnical engineer, which they did not send to the site, done a site investigation, he might have found. But the other thing that I think the board found very persuasive was that the subcontractor, SAR, that they sent out there, took photographs. So he did come back with information, and we don't know whether the photographs he took are the same ones that are referred to later. But what we do know is what you could see out there on the site was a Russian military vessel that had sunk all the way into the ground. And so the question was, would it be reasonable to assume that that was hard soil or the kind of soil that you could roll a 250-ton crane out there on when you knew that it was what the construction subcontractor was calling that soup that had a vessel sunk into it. But what you're saying is that it was not reasonable for them to rely on the report, which the government presented to them, as a representation of the site condition. Well, what the board found that the report represented was that there were soft and very soft soils. And what was unreasonable about CCI's reliance was not whether they relied on the contract documents as a whole or the Andrea report, but what they concluded from it. And that was they took a very narrow view. They looked only at basically 10 numbers out of the entire report, and that was the SBT on the boring logs, which was juxtaposed side-by-side with the verbal descriptions. But they're more than verbal descriptions. It's not a literary flourish to say the soil is very soft. When an engineer says soil is very soft, he means that it has a shear strength of less than 25 kilopascals, 0 to 25. So it's very soft soil. It means something to engineers when they look at that. And the same with soft soil. It's 25 to 50 kilopascals. So they had- Why would you seek to build a pier in those conditions? Why would you seek to- Well, you could build a pier under those conditions. It was the manner in which CCI elected to do that, at least after the fact they elected to do that, because there's no evidence that there was any design for that type of construction. Because they did it onshore, or they used that cell construction, cell formation construction? No. In this case, I believe the open-cell sheet pile design worked. But the manner of construction is what's at issue in this case. And that was when they tried to take that 250-ton crane out there and build from the land side instead of out on the barges. They didn't actually get the crane out there. The pad itself failed under the soft and very soft soil. Why did you approve that construction, the onshore construction? Well, the government doesn't approve the design. What the government does do is it does review the design for basic sort of a gut check. But it doesn't shift liability on the government when you go through the 30, 65, 99 percent design reviews. So it's still the design-build contractor's responsibility to design the project from beginning to end. The government's review doesn't change that. Isn't it the case that initially the RFP was for construction using offshore barges? I believe that's correct, Your Honor, but it didn't require the contractor to do anything in particular. It left the means and methods up to the contractor. And CCI's proposal didn't say what it was going to do. And the government doesn't particularly care how you get it done. What the government cares about is that you provide something that complies with the ultimate requirements of the contract. Well, then why did the government undertake to do a site condition study and provide it and say this is it and you can rely on it if, in fact, you now tell us that they don't care? That's entirely up to the contractor. The troubling thing, we're asked for an equitable adjustment. It's very hard for me to understand that these contractors and all of the engineers and so on, plus all of the government people who say that they don't care how it's done, but the government witnesses said that they did know what was being done. And they did testify as to the production of the Andrea report and the site condition and all the rest of it. And now you are telling us that it was totally unreasonable for this contractor to rely on the information they got from the government and it's all their fault and that ends it. And that's where I'm finding the difficulties. If the government knew then what they testified, any fool would know any engineer at the time and that their engineers knew and everyone else's engineers knew that it wouldn't hold the crane, it wouldn't do this and that, and you couldn't do it this way. And nonetheless, let the contract, wasn't cheap, and said go ahead, do it your way, use our information that we now tell you is flawed and inadequate and doesn't support, perhaps I don't want to overstate their position, but again, we're asked to bring equity to this resolution of this dispute. We have to start all over again, do it a different way, and what they say is double the cost. I know you say it didn't cost quite that much, and to say it's all their fault. Well, Your Honor, the Andrea report wasn't specifically created for this project. It was information. It wasn't? It was not. It was information that the government had and that when the government is letting out. How did they provide it to this contractor? Because the government under the precedent of this court has an obligation to provide contractors with all the information it has. It would have been at risk if it had held anything back. I would not want to be standing here before Your Honor trying to defend a government that was not providing every bit of information that it had. It's in writing. You can rely on it. In fact, the information that was in there was the best information that the government had, and that was the answer to question number 11. They should have said you can't rely on it. This is the best we've got, but it's not good enough. They didn't say that. No, they didn't say that, Your Honor. They didn't say one way or the other about reliance. The government's responsible for the information that it provides to a contractor, but the contractor still has to behave reasonably, and that's built into the standard in international technology. Both sides have to behave reasonably. Absolutely, Your Honor. Oh, absolutely, Your Honor. Reasonableness is part of the exchange here, and that's built into the elements of international technology versus Winter. That is that in the first element, we talk about the contractor's reasonableness and that did they reasonably interpret the contract documents. Well, it stands on the fiction that they did any kind of interpretation at all because the board found that they didn't rely on it. But if we assume that their act of the fact reliance is what we're trying to evaluate, the answer is no, they didn't. Their interpretation of the Andrea report was not reasonable, and the reason why it was not reasonable is because most of the report talked about very soft and soft soil, soils that you couldn't do what they were trying to do upon. You see what's troubling me. You tell me it was not reasonable. It was obviously not reasonable. Any fool and certainly any engineer would know it's not reasonable. Why did the government give them the contract on that basis? The government didn't give them the contract on that basis because the government did not know at the time of contracting how this contractor was going to construct that pier. The contractor's proposal didn't say. The contractor's proposal simply said, at the end of the day, you're going to get a pier in the style of an open-cell sheet pile pier. They got a one-line bid, this is it, $35 million, whatever it is? $40 million, and what the evidence showed was that CCI did an internal review of their own risk at the time that they submitted the bid. And then we found this out after the fact. It was in a document marked internal use only. What they determined internally was that they had underbid this project by $15 million, that they had never done a project estimate, and that CCI itself had never even looked at the contract. That was at the time they submitted the bid, so the government certainly didn't know what CCI was going to do, probably because CCI didn't know what they were going to do, but it certainly wasn't in the request for proposal. And that's why it's when we talk about— You can't be telling us that this is how the government gives a $40 million contract. The government relies on the contractor to do its job. It's a design-build contract, so we don't— In a design-build contract, the government is not saying you have to do it in this particular way. The government wants to give because of the abilities of the contracting community out there to be able to say, okay, do it however you think is best, but give us the product we want at the end of the day. And so that's why the government was looking at a wide range of possibilities. Initially, it thought it wanted an L-shaped pier on piles, but another contractor, CCI in this case, came in and said, well, we've got a better mousetrap. We can give you an open-cell sheet pile design for, I believe it was approximately $40 million, and we'll design it and we'll build it in a turnkey fashion. And so that's the way the contract arrangement was set up. It's common in the industry, and that's what this contractor signed on to do, was to both design and construct this project using its own techniques and its own means and methods. And the government is happy to allow contractors to do that because the more— the more difficult things, the more expensive it is typically. But in this case, the contractor didn't uphold its end of the bargain. It didn't do that due diligence designing the pad. They didn't do that. They waited until after they had gotten the contract to figure out how they were going to do this. They waited until after they got the contract to figure out how much it was going to cost. And I think you're overstating. I am not at all overstating. How could they know what to bid if they just picked a number out of the air and they think, well, this is—you know, pay us this amount and we'll see what happens? Your Honor, I don't know that the record tells us how CCI got to its bid number because we don't have any evidence of a calculation. I'm sure that they're experienced professionals. They probably have some vague idea of how this was going to be done, but their internal review showed that they missed the mark by $15 million. Can I address the reliance question? I mean, the board made a very specific factual finding that they didn't rely on this report. Yes. And, I mean, they rejected the testimony of Mr. Nottingham. There's not a whole lot else that we would find to support the board's substantial evidence finding except the rejection of his testimony is not credible. I did, in response to your friend's argument, look at his appendix site to the government contracting officer statement. Yes. And it does seem to suggest that he thought that they had relied on that. But this seems to be an after-the-fact look back at what had happened. Why isn't this, if you take the whole picture together, enough to render the board's decision lacking in substantial evidence? Right. The one piece of testimony that CCI points to is the major's testimony at the end. The major was not involved with the project at the time of the proposal or the evaluation of the proposals. He was looking solely at the REA. Can you point me to any affirmative substantial evidence that supports the board's decision rather than just a rejection of Mr. Nottingham's testimony? Well, yes, I can, Your Honor. But let me start with the burden was on CCI to come in and pose that element. I understand that. And what the board found at finding number 35 was that there was – and because CCI is the only party that would know whether they relied on it, they would have all the information. And so the board found at finding 35 that there was no documentary evidence and that it disbelieved Mr. Nottingham. But it was also Mr. Dyer's testimony, and this was the internal analysis of the risk that CCI had done at the time of contracting. And what Mr. Dyer said was that they had done no cost testing. Who's Mr. Dyer? Mr. Dyer was an outside contractor that CCI brought in not to do the work on the project. This was to do their own internal risk assessment. And based on the letter that he wrote within the companies, it appears that he was fairly familiar with these gentlemen and the kinds of work that they did. And this is in the record at A6500-6507, and that's his internal risk analysis. And what he said was that they had done no project cost estimate and that CCI had internally discussed the fact that they had never seen the contract before they did the job. And so it was easy at that point for the board to say, okay, we have nothing that shows that you relied upon it. We have your internal letter that says that you didn't read the contract, you didn't do a project cost estimate, you simply didn't rely on the SBT borings because that's the kind of thing that had an architect or an engineer done an analysis of how to build this. You would have some sort of calculations, design drawings, and so forth. And we just don't have that. Could you also clarify for me the other question, or at least get to your response to the other question I asked? Is boring data just the blow counts, or is it the blow count and the descriptors of soft soil and the like? It's the blow counts and the descriptors of the soft soils. And you can see that at page 8418 in the record, and it juxtaposes all of that information and other information. But what you see at 4818 on the left-hand side is elevation information in parentheses, the blow counts, and then the characteristics of the soil that were found there, disturbed, undisturbed, then a graphical representation of the soils that were found. You said 8418? I'm sorry, Your Honor. Alpha 4818 in the record. Say that again. Of 4818. 4818. Yes. And we're obviously starting to get deep into the facts of this case, but the borehole log is the name of the document we're looking at, and that contains all of this, including the descriptor, very soft to soft gray to dark gray silty clay with black spots and or pockets of organic matter, et cetera, et cetera. That's juxtaposed against the elevations in the boring log that's included within the broader Andrea report, which obviously describes the soil. And what about your response to your friend's suggestion that if you have the descriptors versus kind of more specific numbers data that engineers wouldn't necessarily rely on the numbers data? Well, that was not the testimony that all of the experts gave. What they said was that the data were internally conflicting, and that's because the descriptors of soft and very soft are not just rhetorical flourishes. They are, in fact, descriptors of hard scientific data. An engineer can test the data, squeeze it, look at it, read all the information and say, yes, this is very soft soil because it's going to have an internal shear strength of less than 25 kilopascals or whatever that engineer is able to do. The case that they rely on United Contractors is not applicable to what we're doing here. That was a case in which the boring logs showed the absence of water, or showed water, but the contract had a warning in there that said beware of high water. So the conflict was between just a vague statement in the contract, even without regard to any testing or any engineering data, and the boring logs, which showed an absence of water. And so if you're in that circumstance where you're looking at a boring log versus just a general boilerplate contract statement, then yes, you would go with the boring logs. But here the conflict or the ambiguity is within the boring logs themselves, and it's a patent ambiguity. That's what we're talking about here. To the extent that an engineer would think to rely upon the SPT data rather than the entirety of the contract documents, the USAID report, the descriptors of the estuary, the rest of the Andrea report, and focus solely on those 10 numbers, then yes, there's a patent ambiguity in the contract. But a reasonable contractor would know to look at the entire, and international technologies requires the contractor to look at the entire contract. Can I sum up the government's position? Was that the flaw, the mistake that this contractor made was at the very beginning, at the threshold, in taking the information that was provided wherever it came from and whatever it said, and not duplicating it himself? No, Your Honor. The contractor's mistake in this case went much deeper than that. They didn't even look at the information. That is, had they done their due diligence, we could have a conversation about whether it was reasonable or not. We would submit it was not, and the board found it was not. But the contractor's fundamental mistake here was never reading the contract, never estimating the overall project, and never considering... It doesn't show they paid no attention to the soil condition, but that's what I hear you saying, that they just thought we'd just come right in and build this pier and pay no attention to the substructure? Yes, the evidence that, well, I'm not sure that they, they're smart people and they knew they could do, they believed they could do this, but... There was an exchange with the government on this question, so it seems that I, the question is, do we have to accept an extreme argument, which is what I hear you saying, or is there some other basis for the holding that they did not act reasonably and the government did? Well, Your Honor, respectfully, there was no exchange between this contractor and the government. Those questions that we're talking about, can we rely on this information, were not questions that were proposed by this, or asked by this contractor. They were questions that were asked by other contractors that were doing their due diligence on the project. At a meeting at which this contractor was present, I gather they were all there. Well, the questions are actually posed after, they're collected, some during the site visit, some after the site visit, I don't know whether the record's clear here, and then the answers are given and published after the site visit. So you're saying this contractor was fatally flawed in doing an inadequate investigation at the start? That was one of the flaws, yes, Your Honor.  Thank you, Your Honor. Thank you, Your Honor. Your Honor, I'll try and just hit a few points and certainly direct me if you have questions. I wanted to respond to an earlier question on question 42, and I think it's important to go to the language here. The evidence in the record from CCI was that it asked this question, the government said no, someone else asked the question instead. The court found ultimately it didn't matter because the answers were shared with everybody. But the question was, geotechnical conditions. Will the government be providing any bidding assumptions associated with the existing geotechnical conditions? For bidding purposes, should the contractor assume the three borings provided are representative of the entire site? The government's answer to that question, it wasn't a good answer, but this is the answer they decided to give, was the contractor should assume the three borings provided are representative of the entire site for purposes of developing a proposal. So in other words, for putting your bid together... Even if that's the case, if the blow counts are inconsistent with the descriptors, why isn't it unreasonable for the contractor to rely on the blow counts and not the entirety of the boring data? Your Honor, there I have to disagree with my colleague in that the government's own expert, Dr. Abtad, did concede, and this is a point in our brief, that a reasonable contractor, or even engineer for that matter, would look at that hard data first. That's how he would normally do it. Now, he said, well, you couldn't do that here because I walked the site and I probed and I had 20-20 hindsight, and I just don't think that any of this was reasonable for anybody to rely on ultimately. So he just rejects reliance generally. But he concedes that what a professional would do is rely on that hard data, and that makes perfect sense, and that's what all of the experts from CCI also said. You look at the hard data, if there's an ambiguity, there's always going to be a difference between the hard data... The government didn't say rely on the blow counts. They said rely on the boring data. Right, and it has that ambiguity in it, yes, but they resolve it reasonably by looking at the blow count data, which is the hard data that engineers use to drive a calculation. Plus, even if you look at the other... Do you think if those two things obviously conflict in the boring data report, that it's reasonable for the contractor to ignore one and rely on the other? I think you have to make a decision here where the government says rely on this information. You ask the question, they say rely on... Sure, I understand, but you seem to be suggesting that the government is telling you to rely on a limited subset of that data, when I don't read the response as saying that, and so you're making the conscious decision to rely on a subset of that data and not look at the rest of the data. No, I'm not trying to actually do that, Your Honor. I think you do look at that whole boring log, like was just suggested, and there's always a difference between the verbal descriptor and the data. The verbal descriptor is very broad. They say soft, very soft, medium, at different depths. But it's clearly, if you take those terms, they're clearly inconsistent with the blow count data. They are inconsistent. If they're patently inconsistent, then why is it reasonable for the contractor to rely on one and not the other? Your Honor, I don't think that they're patently inconsistent. Number one, that sort of doctrine is used very sparingly in the context of government contracting, because otherwise you give the government... Isn't that data inconsistent with other evidence, like the Russian vehicle that was sunken out at the site? Your Honor, the Russian ship I think is a Red Herring, essentially. Who knows why it sunk and it's somewhere out there, but it wasn't at the specific site the construction was going on at. It's correct that other evidence in the report, the laboratory data, is different than the boring log data. But what I was trying to emphasize before is the ERDC, the government's experts, looked at that data too and said, let's look at this from a worst case scenario for CCI. Let's look at the least favorable data for CCI, which is the shearing laboratory test, and see what you could conclude from that. Now, these are the experts. Now, remember, CCI is just a contractor. It's judged by a reasonable contractor standard. That doesn't include what an expert might glean from all of this, and we could debate endlessly probably from an expert perspective. But what the ERDC said was, well, we looked at that, and at least a three-meter crane pad was feasible here. And there's no dispute that the crane pad instead failed under three meters. So even looking at that data, which is least favorable to CCI in that whole report, so you have a range of information in there, as you've suggested. Had CCI conducted a soil sample test and found the conditions out there unstable, what would that do with your argument with respect to the boring data? Are you still entitled to just focus on the boring data? I think it's important to also look at the phase that we're at here. So the government has sort of tried to mix apples and oranges. The first phase here is just bidding. That went really quickly. The government was in a big hurry. It wanted this project done. It had to prop up the Iraqi Navy. So this went with a three-week process between that and the site investigation, and then three weeks to actual bid acceptance. So we don't have the sort of normal scenario that you might be dealing with here. And what the government is trying to do is rush this along, and CCI is doing the best it can to respond to that scenario. It does the site investigation. It doesn't have time to do its own independent testing. Now, the government could have arranged for an independent test. It decided instead to use this report, as the government conceded, that was generated for some other purpose. It was in a big hurry. It said, all right, well, let's just use this. You guys rely on it, and, in fact, rely on it for everything. Now, if they'd wanted to instead, they could have had their own independent testing. They could have required the contractor to do testing. And if the contractor had done testing and found a different condition, then, yes, I could have done independent testing as well. That's right. But the case law is that at the bid phase, that's not required of the contractor. The government supplies you the information, and when it gives you subsurface data, you're entitled to rely on that data. The government tells you what to use. You don't go run out and do your own independent testing for a variety of policy reasons. That's been the decision by numerous courts. That's a different condition. This is a $40 million contract, and in view of the test that's been set out in International Tech Corp, then it seems when you have ambiguity within the data that you're looking at, even to just make the bid, that there would be some sort of caution. I mean, you have ambiguities. It's rushed. You haven't done your own testing, and yet you tell the government, I can do this. We can do this. In part, the testing comes later. That was the design phase. So there are two different phases, bidding on it and the design phase. And if you get there and find something different than the government's represented, then the policy is that's what the differing conditions clause is for. That's when you then apply to the government and say, you know what? This turned out to be different than what you said. It's going to cost more. We're going to have to do these adjustments. So if this report had just had the blow count data, you'd be on pretty solid ground. Yes. If this report had just had the descriptors, you'd probably lose, right? Your Honor, I guess I do want to make one comment on that. The government really focuses on the descriptors, and there's this perception that there's this magic word that you can use that it was sought. But it's important to note that in the record – Do you disagree that they're terms of art? They are terms of art, but at the same time, what I'd like to add is that this – Let me just make – I don't want to take up too much of your time. But you won't even concede that if it was just the descriptors, that it would have been unreasonable to rely on them to conclude that you could do a land-based pier. Your Honor, the soft comment, these projects are routinely done on soft soils. That's not unusual for this open soil design. They're always on the shore, and shoreline area is frequently soft in some form. So that alone isn't this silver bullet here. It's a factor that you have to take into account. Okay. Any more questions? No questions? Okay. Thank you, Mr. Howard. Mr. Wagner, the case is taken into submission.